UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID EVANS,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>D. STRUVE, et al.,<br><br>　　　　Defendants. | No. 2: 19-cv-1376 JAM KJN P<br><br>ORDER AND FINDINGS AND <u>RECOMMENDATIONS</u> |

Plaintiff is a state prisoner, proceeding without counsel, with a civil rights action pursuant to 42 U.S.C. § 1983. Pending before the court is defendants' motion for partial summary judgment filed October 2, 2020. (ECF No. 57.) Defendants move for summary judgment as to all defendants except for defendant Struve. On November 16, 2020, plaintiff filed his opposition. (ECF No. 62.)

On December 3, 2020, defendants filed a motion for an extension of time to file a reply and a reply. (ECF Nos. 66, 67.) Good cause appearing, defendants' motion for an extension of time is granted. Defendants' reply is deemed timely filed.

For the reasons stated herein, the undersigned recommends that defendants' summary judgment motion be granted.

////

////

Legal Standards for Summary Judgment

Summary judgment is appropriate when it is demonstrated that the standard set forth in Federal Rule of Civil Procedure 56 is met. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting then-numbered Fed. R. Civ. P. 56(c)). "Where the nonmoving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." Nursing Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.), 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp., 477 U.S. at 325); see also Fed. R. Civ. P. 56 advisory committee's notes to 2010 amendments (recognizing that "a party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact"). Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex Corp., 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323.

Consequently, if the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of such a factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material in support of its contention that such a

2

1 dispute exists.  See Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11.  The opposing party
2 must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome
3 of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248
4 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.
5 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return
6 a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436
7 (9th Cir. 1987), overruled in part on other grounds, Hollinger v. Titan Capital Corp., 914 F.2d
8 1564, 1575 (9th Cir. 1990).

9 In the endeavor to establish the existence of a factual dispute, the opposing party need not
10 establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual
11 dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at
12 trial."  T.W. Elec. Serv., 809 F.2d at 630.  Thus, the "purpose of summary judgment is to 'pierce
13 the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"
14 Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963
15 amendments).

16 In resolving a summary judgment motion, the court examines the pleadings, depositions,
17 answers to interrogatories, and admissions on file, together with the affidavits, if any.  Fed. R.
18 Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson, 477 U.S. at
19 255.  All reasonable inferences that may be drawn from the facts placed before the court must be
20 drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587; Walls v. Central Costa
21 County Transit Authority, 653 F.3d 963, 966 (9th Cir. 2011).  Nevertheless, inferences are not
22 drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from
23 which the inference may be drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224,
24 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a
25 genuine issue, the opposing party "must do more than simply show that there is some
26 metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could
27 not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for
28 trial.'"  Matsushita, 475 U.S. at 586 (citation omitted).

By contemporaneous notice provided on March 16, 2020 (ECF No. 54), plaintiff was advised of the requirements for opposing a motion brought pursuant to Rule 56 of the Federal Rules of Civil Procedure.  See Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (*en banc*); Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).

Plaintiff's Claims

This action proceeds on plaintiff's original complaint as to defendants Struve, Gonzales, Dingfelder, Richardson, Calderon, Valice, Sidebotham and McCarval.  (ECF No. 1 at 7.)

Plaintiff alleges that on May 23, 2018, an alarm was sounded on the yard where plaintiff was located when an inmate tried to attack another inmate.  (Id. at 9.)  When an alarm sounds, inmates are expected to sit down in their immediate location.  (Id.)  When plaintiff heard the alarm on May 23, 2018, he immediately sat down in a grassy area on the foundation of a light pole as several officers yelled, "get down."  (Id.)

Plaintiff began instructing another inmate who was near him to comply with the officers and get down.  (Id.)  At that time, an officer yelled at plaintiff to be quiet.  (Id.)

Lieutenant Hampton instructed plaintiff to get up and relocate to the other side of the walkway.  (Id.)  When plaintiff complied with Lieutenant Hampton's request, defendant Struve ordered plaintiff to "get down," and simultaneously placed his right hand on plaintiff's neck and forced plaintiff's face down on the ground.  (Id.)  Defendant Struve then kneed plaintiff by placing his knee in the center of plaintiff's back to cause plaintiff greater pain.  (Id.)  Defendant Struve then placed his knee on the back of plaintiff's neck, using his body weight to cause greater pain and suffering, choking plaintiff and making it difficult for plaintiff to breathe.  (Id.) Defendant Struve yelled, "stop resisting," even though plaintiff did not resist.  (Id.)

Citing exhibit A, plaintiff alleges that Lieutenant Hampton confirms that plaintiff did not resist.  (Id.)  Exhibit A to the complaint is a report prepared by Lieutenant Hampton regarding the incident.  (Id. at 14-16.)  The report identifies defendants Struve, Valice and Richardson as witnesses.  (Id. at 14.)  The undersigned herein sets forth the description of the incident contained in Lieutenant Hampton's report:

////

> On May 23, 2018, at approximately 1255 hours I was assisting A Facility 7 building recall their building due to a Code 3 at the Minimum Facility. I then notice an Inmate running across the grassy area from 6 building towards 5 building SHU wall. As I responded, I heard unidentified staff members stating get down. I made two radio announcements over the state issued radio for 5 and 6 Building Control to open their window for gun coverage. Once I arrived on the grassy area, approximately three feet from the light poll, I observed two inmates sitting on the light poll and another unidentified inmate in the prone position on the other side of the light poll. In order to create space and keep noninvolved inmate away from the scene, I ordered the first inmate sitting on the light poll to relocate to the other side of the walkway. The second inmate was EVANS (AU6627-A6-228) and I ordered EVANS to move to the other side of the walkway as well. EVANS was speaking to the unidentified Inmate which was in the prone position and telling the unidentified inmate to comply with the Officers. Unidentified staff members were telling EVANS to be quiet. I ordered EVANS to get up and walk to the other side of the walkway. Officer D. Struve ordered EVANS to get down and simultaneous placed his right hand on EVANS neck and forced EVANS face down to the ground. Officer Struve then mounted EVANS by straddling both legs around EVANS mid back area. Officer Struve then ordered EVANS to cuff up and stop resisting. EVANS stated I'm not moving and not resisting. I then stated for everyone to calm down. Officer Struve applied handcuffs with the assistants from an unknown Officer. Officer Struve transitioned to placing his right knee on EVANS neck. I then ordered Officer D. Richardson which was standing to my left to holster his OC pepper spray and relieve Officer Struve. As EVANS was being assisted to his feet, Officer Struve stated, put legs on him. Once leg restraint were placed on EVANS, Officer Richardson and other staff assisted EVANS to his feet, I directed Sergeant J. Valice to accompany the escort to A Facility Sally port.
>
> It should be noted:
>
> I did not observe EVANS resist during this incident.
>
> The majority of the aforementioned statements by EVANS and Officer Struve were inappropriate (cursing/swearing at each other) which increased the [in]ability [to] calm the incident.

(Id. at 14, 16.)

Plaintiff alleges that the excessive force committed by defendant Struve occurred in front of defendants Gonzales, Dingfelder, Richardson, Calderon, Valice, Sidebotham and McCarval, who failed to intervene as they watched the incident. (Id. at 10.)

Plaintiff alleges that he was bedridden for several days as a result of defendant Struve's "take down" and "drill choke" technique applied to plaintiff's back and neck area. (Id. at 9-10.)

Plaintiff alleges that he required physical therapy as a result of the injuries he suffered. (Id. at

5

1  10.)

2  Defendants' Summary Judgment Motion

3  *Legal Standard*

4  The Eighth Amendment requires prison officials "[to] take reasonable measures to
5  guarantee the safety of the inmates." Farmer v. Brennan, 511 U.S. 825, 832 (1994) (internal
6  quotation marks omitted).  Accordingly, a prison official violates the Eighth Amendment by
7  failing to intervene when another prison official is seen using excessive force on an inmate.  See
8  Robins v. Meecham, 60 F.3d 1436, 1442 (9th Cir. 1995).  A prison official may be held liable for
9  such failure to intervene, however, only if the official was aware that the inmate faced a specific
10 risk of harm from the other prison official's use of excessive force and had a reasonable
11 opportunity to intervene to stop it.  See Richards v. Foutch, 2014 WL 4449822, at *7 (C.D. Cal.
12 Sept. 9, 2014).  A defendant who moves for summary judgment on such an Eighth Amendment
13 claim has the burden to show that there was no reasonable opportunity to intervene.  See e.g.,
14 Robins v. Meecham, 60 F.3d 1436, 1442 (9th Cir. 1995) (denying summary judgment to the
15 prison officials who "failed to carry their burden" to show they could not have prevented their
16 fellow officer from using excessive force).

17 *Analysis—Did Defendants Fail to Intervene in Violation of the Eighth Amendment?*

18 In the summary judgment motion, defendants do not dispute plaintiff's claim that
19 Lieutenant Hampton told plaintiff to get up and move, after which defendant Struve yelled at
20 plaintiff to get down.  (ECF No. 57-9 at 2-3.)  For purposes of the summary judgment motion,
21 defendants do not dispute plaintiff's allegations regarding defendant Struve's alleged use of
22 excessive force.  (ECF No. 57 at 10 n.3; ECF No. 57-9 at 3.)

23 Defendants argue that there is no evidence that the defendants moving for summary
24 judgment knew of and intentionally ignored a risk that defendant Struve would use force on
25 plaintiff.  (ECF No. 57 at 10.)  Defendants argue that there is no evidence that defendants had a
26 realistic opportunity to intervene to stop defendant Struve from using force, even if they had seen
27 it.  (Id.)  Defendants contend that at his deposition, plaintiff estimated that the incident took
28 perhaps two minutes.  (Id.)  Given these facts, defendants argue that no reasonable juror could

6

believe that these defendants failed to protect plaintiff from a serious risk of harm.  (Id. at 11.)

In support of the summary judgment motion, defendants cite the declarations of defendants.  The undersigned sets forth these declarations herein.

In their declaration, defendant Calderon states, in relevant part,

> 2.  I am a Correctional Sergeant at the California State Prison in Sacramento, California.  I have worked in the California Department of Corrections and Rehabilitation (CDCR) for 11 years.
>
> 3.  On May 23, 2018, I was assigned as the Facility A Enhanced Outpatient Program Sergeant.  While recalling the inmates in front of housing unit A-7, I heard a commotion coming from the area of unit A-5.  I turned and saw Officer Miller extend his baton and order an inmate to "get down," which the inmate complied with.  A skirmish line was formed near unit A-5 in front of the light pole because a few inmates were yelling obscenities at the officers.  I heard plaintiff Evans say, "Fuck these guys."  Inmate Flores was also yelling obscenities.
>
> 4.  I watched inmate Flores being handcuffed.  When I turned back toward plaintiff, I saw Officer Struve kneeling next to plaintiff, with his hands placed on plaintiff's back to control him.  I did not see plaintiff resisting but I heard him keep saying, "Fuck these guys. Fuck you."
>
> 5.  Once plaintiff was handcuffed, another officer relieved Officer Struve and plaintiff was escorted off the yard.  I did not see any visible injuries to plaintiff.
>
> 6.  I did not see Officer Struve use excessive or unnecessary force during the incident.  I did not see Officer Struve put his knee or leg on plaintiff's back or neck, and I did not hear him use any profanity toward plaintiff.  A knee or hand on the back is permitted for restraint if needed.
>
> 7.  If I had seen any officer use excessive force during the incident, I would have intervened to stop it if I had the opportunity (i.e., if I was close enough and it was continuing), or I would report it afterward if I witnessed it but was unable to stop it, as is my duty as a peace officer.
>
> 8.  I did not hear Lieutenant Hampton give any verbal commands for plaintiff to move during the incident, or any announcements on the radio about inmate movement.  It is common practice to make a radio announcement for authorized inmate movement, to alert staff.

(ECF No. 57-1 at 1-2.)

////

////

In their declaration, defendant Dingfelder states, in relevant part,

> 2. I am a Correctional Officer at the California State Prison in Sacramento, California. I have worked in the California Department of Corrections and Rehabilitation (CDCR) for approximately 14 years.
>
> 3. On May 23, 2018, I was standing outside housing unit A-7 and A-8 during yard recall when I saw an inmate jump up toward another inmate who was being escorted, as if to attack him. The tower officer announced on the P.A. system "down on the yard," meaning that all inmates had to get down on the ground. Responding staff ran toward the incident. A skirmish line, with officers ready to engage if needed, formed near units A-5 and A-6.
>
> 4. I saw inmate Flores laying down on his stomach but with one leg back and one leg forward underneath him, and his fingertips on the ground, as if he was going to run. I ordered Flores to "get down," and he laid prone on the ground and put his hands out to the side. At the same time, I heard Evans yell "Don't do it! You don't have to do it! This is police brutality!" I believed that plaintiff was talking to inmate Flores, inciting him to disobey orders.
>
> 5. As I heard plaintiff yelling, I noticed that he was seated on the concrete barrier of a light post. Officer Struve walked over toward plaintiff and told him, "Evans, get down. I am going to cuff you up." Plaintiff replied, "Fuck you, Struve."
>
> 5. Officer Struve then approached plaintiff and reached for his arm, but plaintiff pulled away. Officer Struve pushed plaintiff forward into a supine position on the ground, using his body weight. I did not see Officer Struve place his arms or legs on plaintiff's back or neck area. Plaintiff continued to yell, "go fuck yourself!" to Officer Struve. I assisted by placing leg restraints on plaintiff because he was agitated. While I was applying leg restraints, Officer Struve handcuffed plaintiff. I then escorted plaintiff to the holding cell in the sallyport.
>
> 6. I do not call hearing Lieutenant Hampton give any verbal commands for plaintiff to move during the incident, or any announcements on the radio about inmate movement.
>
> 7. I did not see Officer Struve use excessive or unnecessary force during the incident. I was next to plaintiff when he was being handcuffed, but I was looking at his feet/ankles in order to apply the leg restraints. I did not hear anything to indicate that excessive force was being used while I was focused on the leg restraints, such as a cry of pain.
>
> 8. If I had seen any officer use excessive force during the incident, I would have intervened to stop it if I had the opportunity (i.e., if I was close enough and it was continuing), or I would report it afterward if I witnessed it but was unable to stop it, as is my duty as a peace officer.

(ECF No. 57-2 at 1-3.)

In their declaration, defendant Gonzales states, in relevant part,

> 2. I am a Correctional Sergeant at the California State Prison in Sacramento, California. I have worked in the California Department of Corrections and Rehabilitation (CDCR) for approximately 14 years.
>
> 3. On May 23, 2018, I heard a radio transmission for an incident occurring on the small yard of Facility A. I responded and noticed a staff skirmish line in front of housing units A-5 and A-6. I also saw multiple inmates laying in a prone position (on their stomachs), which is what they are supposed to do following an alarm on the yard.
>
> 4. I noticed that plaintiff Evans was not prone on the ground, but was instead seated on a concrete barrier on a light post. Plaintiff was yelling something and appeared to be inciting the other inmates. I heard several staff give plaintiff commands to "prone out," but he ignored these orders.
>
> 5. I also heard Officer Struve give plaintiff several verbal commands to "prone out." Officer Struve then approached plaintiff, put his hands on plaintiff's shoulder, pulled him to a supine position on the ground, and then handcuffed plaintiff. I did not see Officer Struve place a knee on plaintiff, though he did kneel on the ground next to plaintiff when he reached for plaintiff's arms in order to handcuff him.
>
> 6. I did not hear Lieutenant Hampton give any verbal commands for plaintiff to move during the incident, and I did not hear anything on the radio about inmate movement.
>
> 7. I did not see Officer Struve use excessive or unnecessary force during the incident. I was approximately 8 feet away from plaintiff, and was standing behind the skirmish line of officers.
>
> 8. If I had seen any officer use excessive force during the incident, I would have intervened to stop it if I had the opportunity (i.e., if I was close enough and it was continuing), or I would report it afterward if I witnessed it but was unable to stop it, as is my duty as a peace officer and a supervisor.

(ECF No. 57-3 at 1-2.)

In their declaration, defendant McCarvel states, in relevant part,

> 2. I am a Correctional Sergeant at the California State Prison in Sacramento, California. I have worked in the California Department of Corrections and Rehabilitation (CDCR) for approximately 22 years.
>
> 3. On May 23, 2018, I was assigned as the Sergeant for the treatment center in Facility A. I heard a code 3 alarm at the minimum support

> facility, and then I heard a code 1 alarm at the upper area of the small yard. I responded to the outside area in front of housing units A-5 and A-6.
>
> 4. When I arrived, I saw inmate Flores on the ground and plaintiff Evans was sitting on the concrete foundation near the light pole. Inmate Flores was yelling, "Fuck you guys! Fuck the police!" Plaintiff was also yelling at the officers.
>
> 5. Plaintiff was given several orders by staff to "prone out," because he was in a seated position and not laying down prone. Plaintiff yelled, "fuck you" and ignored the orders.
>
> 6. Officer Struve gave plaintiff verbal commands to "get down," which plaintiff ignored. Officer Struve then walked over to plaintiff, grabbed his harm, and pulled him forward into a supine position. Officer Struve briefly placed his knee onto plaintiff's lower back as he handcuffed plaintiff. He had to reach for plaintiff's hands in order to cuff them. Plaintiff told Officer Struve he was a "bitch."
>
> 7. I did not see Officer Struve put a knee on plaintiff's neck. Once plaintiff was handcuffed, Officer Struve moved his knee off plaintiff's lower back and remained kneeling next to plaintiff. Other officers took plaintiff and escorted him out of the area. I did not see any visible injuries on plaintiff.
>
> 8. I did not see Officer Struve use excessive or unnecessary force during the incident. If I had seen any officer use excessive force during the incident, I would have intervened to stop it if I had the opportunity (i.e., if I was close enough and it was continuing), or I would report it afterward if I witnessed it but was unable to stop it, as is my duty as a peace officer and a supervisor.
>
> 9. I did not hear Lieutenant Hampton give any verbal commands for plaintiff to move during the incident, or any announcements on the radio about inmate movement. It is protocol to make a radio announcement for authorized inmate movement, to alert other staff.

(ECF No. 57-4 at 1-3.)

In their declaration, defendant Valice states, in relevant part,

> 2. I am a Correctional Sergeant at the California State Prison in Sacramento, California. I have worked in the California Department of Corrections and Rehabilitation (CDCR) for approximately 13 years.
>
> 3. On May 23, 2018, I was assigned as the Clinic Sergeant for Healthcare Access. I responded from the treatment center because of a fight on the small yard of Facility A.
>
> 4. When I arrived, I saw a skirmish line facing housing unit A-6. Plaintiff Evans was sitting and leaning his back against the light pole and inmate Flores was on the grass area. Plaintiff and inmate Flores were yelling back and forth at each other, and then they started to

> yell at the officers on the skirmish line. Plaintiff was given orders to "get down" by several officers.
>
> 5. Plaintiff said to inmate Flores, "Fuck these guys," referring to the officers. Officer Struve gave plaintiff orders to "get down" and "prone out," but plaintiff ignored those orders.
>
> 6. I saw Officer Struve walk up to plaintiff and grab his shoulder. Plaintiff immediately pulled away and twisted his upper body. Officer Struve then pulled plaintiff to a prone position on the ground, and then placed handcuffs on him. I saw Officer Struve kneeling next to plaintiff, but I did not see him put a knee on plaintiff. Officer Dingfelder placed leg restraints on plaintiff and escorted him off the yard.
>
> 7. I did not see any visible injuries to plaintiff.
>
> 8. I did not see Officer Struve use excessive or unnecessary force during the incident. I did not see Officer Struve put his knee or leg on plaintiff's back or neck, and I did not hear him use any profanity toward plaintiff.
>
> 9. Sometimes an officer places a knee or hand on an inmate's back during the restraint process, in order to keep them controlled to apply handcuffs, and this is not excessive force so long as only the force necessary to control the prisoner is used and not any extra or unjustified force.
>
> 10. If I had seen any officer use excessive force during the incident, I would have intervened to stop it if I had the opportunity (i.e., if I was close enough and it was continuing), or I would report it afterward if I witnessed it but was unable to stop it, as is my duty as a peace officer and a supervisor.
>
> 11. I did not hear Lieutenant Hampton give any verbal commands for plaintiff to move during the incident, or any announcements on the radio about inmate movement. It is common sense to make a radio announcement for authorized inmate movement, to alert staff.

(ECF No. 57-5 at 1-3.)

In their declaration, defendant Richardson states, in relevant part,

> 2. I am a Correctional Officer at the California State Prison in Sacramento, California. I have worked in the California Department of Corrections and Rehabilitation (CDCR) for approximately 5 years.
>
> 3. On May 23, 2018, I was the yard officer in Facility A. I heard an announcement for a code 1 alarm on the small yard of Facility A. I responded to the alarm and stood in the skirmish line, ready to assist in case the incident escalated. I saw plaintiff Evans approximately 15-25 feet away, in a crouched position against a light pole. All of the other inmates I saw on the yard were laying down prone on their stomachs.

11

> 4. Officer Struve, who was also standing in the skirmish line, yelled at plaintiff "get down." Officer Struve approached plaintiff and tried to handcuff him, but plaintiff tucked his hands under his chest so he could not be handcuffed. Officer Struve ordered him, "stop resisting," but plaintiff kept his hands tucked under him. Officer Struve used some of his body weight (leaning with his hip into plaintiff's mid-back area) in order to handcuff him. Plaintiff arched his back and moved away, trying to resist, but Officer Struve managed to pull plaintiff's arms out from underneath him and handcuff plaintiff, who then called Officer Struve, "punk bitch."
>
> 5. Once plaintiff was handcuffed, I relieved Officer Struve and conducted a pat search of plaintiff. I then escorted plaintiff to the holding cell in the sallyport, along with Officer Dingfelder. I did not see any visible injuries to plaintiff, and he did not mention any injuries to me.
>
> 6. I did not see Officer Struve use excessive force or unnecessary force during the incident. Officer Struve did not put his knee or leg on plaintiff's back or neck, and I did not hear him use any profanity toward plaintiff.
>
> 7. If I had seen any officer use excessive force during the incident, I would have intervened to stop it if I had the opportunity (i.e., if I was close enough and it was continuing), or I would report it afterward if I witnessed it but was unable to stop it, as is my duty as a peace officer.
>
> 8. I did not hear Lieutenant Hamptom give any verbal commands for plaintiff to move during the incident, or any announcements on the radio about inmate movement. It is common practice to make a radio announcement for authorized inmate movement, to alert staff.

(ECF No. 58 at 1-3.)

In their declaration, defendant Sidebotham states, in relevant part,

> 2. I am a Correctional Officer at the California State Prison in Sacramento, California. I have worked in the California Department of Corrections and Rehabilitation (CDCR) for approximately 25 years.
>
> 3. On May 23, 2018, I was assigned as the officer in the observation tower on A yard, located near buildings 5 and 6. During the controlled yard recall on Facility A, I saw inmates staging on the small yard, in front of units A-5 and A-6 on the grass area.
>
> 4. As an officer was escorting an inmate to unit A-5, I saw inmate Mondine jump up and start running toward the inmate being escorted. He then ran back, and staff ordered him to "get down." Inmate Flores had been seated, and he jumped up to yell at the inmate being escorted, though I could not hear what he said. Responding staff approached inmate Flores and handcuffed him.

12

> 5. At the same time, plaintiff Evans was yelling at inmate Mondine. He was in a prone position near the light pole but appeared to be lifting himself up, as if he was going to jump up.
>
> 6. I saw Officer Struve approach plaintiff, grab plaintiff's hands and handcuff him. Officer Struve then kneeled next to plaintiff and put his hand on plaintiff's mid-back or shoulder blades to keep him still. Plaintiff was moving his legs around, so Officer Struve placed his leg on plaintiff to stop him from moving.
>
> 7. Once plaintiff was handcuffed, Officer Struve backed 5-10 feet away, and other staff escorted plaintiff to the sallyport holding cell. I could not see any visible injuries on plaintiff.
>
> 8. I did not see Officer Struve put a knee on plaintiff's neck or back. Nor did I see Officer Struve use excessive or unnecessary force during the incident. If I had seen any officer use excessive force during the incident, I would have radioed an officer on the ground to stop it if I had the opportunity (i.e., if it was continuing), or I would report it afterward if I witnessed it but was unable to help stop it, as is my duty as a peace officer.
>
> 9. I do not know Lieutenant Hampton. I did not hear a radio announcement for inmate movement during the incident. It is general practice to make a radio announcement for inmate movement.

(ECF No. 59 at 1-3.)

Citing plaintiff's deposition transcript, defendants argue that there is no evidence that any of the defendants had a realistic opportunity to intervene and stop defendant Struve from tackling and restraining plaintiff because plaintiff testified that the incident took perhaps two minutes. (ECF No. 57 at 22.)

At his deposition, did not testify that the incident took two minutes:

> Q: How long—how long was it between the time that Officer Struve pushed you to the ground before you were –before he was relieved by Officers Richardson and Dingfelder?
>
> A: I'm not—I'm not actually—I don't know.
>
> Q: Would you say a minute, two minutes?
>
> A: I don't know.
>
> Q: Can you give me an estimate?
>
> A: Honestly, like I don't—I don't—I mean, I don't want to guess on that. I'm not sure for sure, so I don't want to guess and, you know, I don't—

13

        Q: From your description, it sounds like it was less than five minutes; do you agree with that?

        A: Yes.

        Q: Okay. And you—you're not sure if it was less than, say, two minutes?

        A: No.

(Plaintiff's transcript at 45-46.)

Defendants also argue that at his deposition, plaintiff testified that he did not know what defendants Gonzales, Dingfelder, Richardson, Calderon, Valice, Sidebotham and McCarval were doing during the incident. (See Plaintiff's deposition at 45.) While plaintiff testified that he did not know exactly where these defendants were during the incident, he also testified that they were close enough to the incident to write reports containing their (false) observation that plaintiff resisted defendant Struve. (Id.)

After reviewing the record, including plaintiff's opposition, the undersigned finds no evidence demonstrating that defendants Gonzales, Dingfelder, Richardson, Calderon, Valice, Sidebotham and McCarval knew of and intentionally ignored a risk that defendant Struve would use force against plaintiff. The undersigned also finds no evidence in the record demonstrating that any of these defendants participated in the alleged excessive force.

After reviewing defendants' declarations, the undersigned finds that defendants Gonzales, Dingfelder, Richardson, Calderon, Valice, Sidebotham and McCarval were in the area where the alleged excessive force occurred. This finding is based on the statements in defendants' declarations regarding their observations of the incident. The undersigned cannot determine exactly how close each defendant was to the incident based on the information in the declarations.

However, for the reasons stated herein, the undersigned finds that defendants Gonzales, Dingfelder, Richardson, Calderon, Valice, Sidebotham and McCarval did not have a reasonable opportunity to intervene in the alleged excessive force.

As discussed above, plaintiff submitted Lieutenant Hampton's report in support of his complaint. Plaintiff does not dispute the statements made by Lieutenant Hampton in this report. Lieutenant Hampton's report indicates that Lieutenant Hampton was present during the incident

14

of alleged excessive force and took steps to intervene.  Based on Lieutenant Hampton's intervention in the incident, it is unclear what further actions defendants Gonzales, Dingfelder, Richardson, Calderon, Valice, Sidebotham and McCarval could have taken to intervene, assuming they were near the incident.  For these reasons, the undersigned finds that these defendants did not have a reasonable opportunity to intervene when defendant Struve allegedly used excessive force against plaintiff.  Accordingly, defendants' summary judgment should be granted on these grounds.

*Analysis—Are Defendants Entitled to Qualified Immunity?*

In Saucier v. Katz, 533 U.S. 194 (2001), the Supreme Court set forth a two-pronged test to determine whether qualified immunity exists.  First, the court asks: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"  Id. at 201.  If "a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established."  Id.  To be "clearly established," "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  Id. at 202 (internal quotation marks and citation omitted).  Accordingly, for the purposes of the second prong, the dispositive inquiry "is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  Id.  Courts have the discretion to decide which prong to address first, in light of the particular circumstances of each case.  See Pearson v. Callahan, 555 U.S. 223, 236 (2009).

As discussed above, the undersigned finds that defendants Gonzales, Dingfelder, Richardson, Calderon, Valice, Sidebotham and McCarval did not violate the Eighth Amendment by failing to intervene.  However, in an abundance of caution, for the reasons stated herein, the undersigned finds that defendants should be granted qualified immunity based on the second prong of the qualified immunity test.

As discussed above, Lieutenant Hampton intervened in the incident.  Lieutenant Hampton was a senior officer to defendants, who were correctional sergeants or correctional officers. Based on these circumstances, the undersigned finds that it would not be clear to a reasonable

15

correctional officer or correctional sergeant that their failure to intervene violated plaintiff's Eighth Amendment rights.  Accordingly, defendants should be granted qualified immunity on these grounds.

Conclusion

Following the district court's adoption of these findings and recommendations, the undersigned will set this action for trial as to plaintiff's Eighth Amendment claim against defendant Struve.

Accordingly, IT IS HEREBY ORDERED that defendants' motion for an extension of time (ECF No. 66) is granted; defendants' reply is deemed timely filed; and

IT IS HEREBY RECOMMENDED that defendants' summary judgment motion (ECF No. 57) be granted.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, plaintiff may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Plaintiff is advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated:  March 15, 2021

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

Evans1376.sj